Frank H. MASTIE and Kenneth J.
Seymour, Plaintiffs,

v.

GREAT LAKES STEEL CORPORATION,
a Michigan Corporation, Defendant.

Civ. No. 38681.

United States District Court,
E. D. Michigan, S. D.

Dec. 20, 1976.

covers for loss of earning power. The court did not indicate why the same threat would not hold true where a working wife was injured, except to say that since twice as many married men are employed than married women, the law could justifiably discriminate in this respect between spouses. This Court disagrees. Furthermore, joinder of the bodily injury and consortium claims, together with proper jury instructions can easily overcome this problem. *See,* n.12, supra and n.15, infra.
Although *Krohn v. Richardson-Merrell, Inc.,* 219 Tenn. 37, 406 S.W.2d 166 (1966), *cert. den.,* 386 U.S. 970, 87 S.Ct. 1160, 18 L.Ed.2d 129 (1967), has also been cited for the proposition that a disparity in spousal consortium rights is not violative of the equal protection clause, the court therein expressly refused to decide the constitutional question.

15. In accordance with the position taken by the American Law Institute in Restatement Second, the consortium claim must, where possible, be joined with the claim for bodily injury. *See,* Tent. draft No. 14, supra, n.7.

Peter Van Horne, Detroit, Mich., for plaintiffs.

Douglas H. West, Richard C. Sanders, Detroit, Mich., for defendant.

## OPINION

GUY, District Judge.

Plaintiffs, Frank Mastie and Kenneth Seymour, brought this action pursuant to

the Federal Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621, *et seq.*, Public Law 90–202, claiming discrimination on the basis of age. Although disposition of the respective plaintiffs' claims are technically distinct, as will become apparent from the court's discussion of this matter, they may be treated as one case.

The case was tried before the court without a jury. The court, having considered the pleadings, the testimony of the witnesses, the documents in evidence, the stipulations of the parties, and being otherwise fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Rule 52, Federal Rules of Civil Procedure.

Plaintiffs, Mastie and Seymour, commenced employment with defendant Great Lakes Steel Corporation on November 1, 1935, and March 10, 1936, respectively. Mastie was hired as a laborer in defendant's Ecorse steel mills and remained in that classification until sometime in 1947 when he was promoted to No. 2 slab yard foreman at the 96 inch mill. Mastie also worked at the No. 3 slab yard at the 96 inch mill at various times from 1947 to 1971, and the No. 5 and No. 6 slab yards at the 80 inch mill from 1962 to 1964. Mastie had also served as a labor foreman. Seymour was also hired by defendant as a laborer and subsequently was promoted to foreman in 1955. During a production slowdown in defendant's 96 inch mill in 1962, Seymour was returned to a laborer classification. After production had been restored, Seymour was returned to the foreman classification in 1965 on the request of William Rees, superintendent of the 96 inch mill at that time. Seymour worked primarily at the 96 inch mill; however, at times, he also worked in temporary assignments at the 80 inch mill in the No. 5 and No. 6 slab yards. Seymour has also worked as mill, labor and scarfing foreman at various times during his career at Great Lakes.

Although the 80 and 96 inch mills are supervised by different superintendents, both mills are under the common supervision of one manager and, except for differences in kind, the two mills operate essentially the same in principle. Both the 80 and 96 inch mills are part of the defendant's hot mill operations.

In 1971, Great Lakes Steel decided to terminate operations at the 96 inch hot mill. The 96 inch mill had become obsolete and also more costly to operate than more modern mills in current operation. As a matter of fact, as soon as the 80 inch mill was installed in 1961, it was contemplated that the 96 inch mill would eventually be phased out of operation. However, the testimony at trial indicated that the decision to shut down the 96 inch mill was first orally communicated to Rees, manager of the entire hot mill operations from 1968 to 1972, by Burt Fishley, Rees' supervisor, sometime during the spring of 1971. Thereafter, Dale Klemans, superintendent of the 96 inch hot mill, was informed of the decision by Rees in late June or early July of that year. The employees at the mill were not told of the impending shut down until sometime thereafter, apparently in mid-July. Rees indicated in his testimony that he had begun to plan for the mothballing of the mill and transfer of the 96 inch mill employees shortly after being informed of the planned shut down. In anticipation of this, vacancies which developed in the hot mill operations were kept open to determine whether employees currently employed at the 96 inch mill could be transferred into those positions.

Prior to the curtailment of operations on the 96 inch mill, Rees commenced an evaluation process which encompassed all the supervisory employees then employed at the 96 and 80 inch mills. Listed below are the twenty persons evaluated by the company along with factual data as to each employee which the court finds pertinent:

| NAME | AGE ON 9/30/71 | YEAR STARTED | JOB TITLE |
|---|---|---|---|
| Gregoire | 28 | 1961 | Foreman |
| Dupler | 29 | 1960 | Foreman |
| Michaelis | 33 | 1969 | Labor Foreman |
| Judd | 33 | 1957 | Turn Foreman |
| Roman | 37 | 1952 | Foreman |
| Redman | 39 | 1958 | Turn Foreman |
| Beard | 40 | 1950 | Turn Foreman |
| Taurence | 43 | 1944 | Senior Labor Foreman. |
| Romanowski | 43 | 1949 | Foreman |
| Bowdler | 46 | 1948 | General Foreman |
| Ransom | 47 | 1959 | Foreman |
| Hanak | 47 | 1948 | Turn Foreman |
| Gardner | 48 | 1947 | Turn Foreman |
| Haskamp | 52 | 1937 | Foreman |
| Cason | 54 | 1949 | Foreman |
| Eastman | 54 | 1939 | Turn Foreman |
| Seymour | 56 | 1936 | Foreman |
| Sawicki | 56 | 1937 | Asst. General Foreman |
| Mastie | 56 | 1935 | Foreman |
| Petoskey | 61 | 1933 | Foreman |

Although the plaintiffs dispute defendant's designation of the group of employees that were evaluated for the limited number of positions available, the court feels inclined to give great deference to the defendant's own determination in this regard. Needless to say, the court must scrutinize the defendant's determination to assure itself that such categorization was not arbitrary or without some business justification. It would be impermissible for an employer to include in the evaluated group of employees some who occupied positions wholly distinct from other employees in the group. However, on the basis of the testimony of several witnesses in this case, there is little doubt that the group of employees chosen by the defendant to be included in the evaluated group was reasonable. Foremen at the 96 inch mill could clearly occupy foremen positions at the 80 inch mill. Also, it was possible for 96 inch mill slab yard foremen to perform as heat or furnace foremen. Although steam and fuel experience would be helpful for the furnace foreman position, it was by no means absolutely necessary. As a matter of fact, one furnace foreman had no steam and fuel background. However, the court does find that the general foreman at the 80 inch mill, Mr. Bowdler, should not have been included in the evaluated group. In this regard, it was permissible to include the assistant general foreman of the 80 inch mill since it was possible by promotion for employees from the 96 inch mill to fill the assistant general foreman position. On the other hand, it is not plausible to believe that any of the 96 inch mill employees could have been promoted to general foreman of the 80 inch mill, since the assistant general foreman position or some comparable supervisory experience was a necessary predicate to becoming general foreman. Thus, with the exclusion of Bowdler, the remaining employees included in the evaluated group by the company bear a reasonable relationship to the qualifications necessary to perform the positions potentially available to be filled.

To aid in evaluating these nineteen employees, Rees sought the help of Klemans and Mr. Morgan, superintendent at the 80 inch mill. Klemans was assistant superintendent of the 96 inch hot mill from April, 1968 to April, 1970, and superintendent of the same mill from April, 1970 until its closing. In formulating his evaluations on the employees under his responsibility at the 96 inch mill, Klemans relied on his own personal observations of the employees while under his supervision and standard evaluation forms of the same employees prepared by him in April, 1970. The evaluations formulated by Klemans in July, 1971 corresponded in substantial degree to the 1970 standard evaluation forms. These evaluations were easily translated into numerical totals indicating that plaintiffs Mastie and Seymour were ranked the lowest of the nineteen employees rated by Klemans.[1] As a result of these re-evaluations,

---

1. It should be noted that Mr. Redman was not evaluated in 1969 because he had been transferred out of the 96 inch mill area by the former superintendent, Mr. Graebar. Redman was, however, later returned to the 96 inch mill. Also, the 1969 evaluation for Gardner was incomplete. Of the other employees rated,

the numerical totals for the seventeen employees from highest to lowest are as follows: Michaelis, 67; Hanak, 64; Taurence, 63; Gregoire, 60; Sawicki, 60; Beard, 57; Judd, 55; Dupler, 51; Roman, 49; Cason, 49; Petoskey, 48; Eastman, 46; Haskamp, 45; Romanowski, 43; Ransom, 39; Mastie, 35; and Seymour, 34.

Klemans was able to make certain recommendations to Rees concerning employees that should or should not be transferred to other positions in the steel mill. Klemans recommended in pertinent part that if there were insufficient positions in which to transfer all 96 inch mill supervisory employees, plaintiffs Mastie and Seymour should be the first two employees terminated or requested to take early retirement.

In arriving at his final evaluations and recommendations concerning which employees should be transferred, Rees utilized the Morgan and Klemans evaluations, his own personal observations of the employees, and the April, 1970 evaluation forms of the employees under consideration. Moreover, although Rees testified that in 1971 he did not look at the employee evaluation forms prepared in 1968 and 1969, he had previously reviewed those evaluations and in 1971 had a general idea of what they contained. However, it is clear from Rees' testimony that he did not specifically rely on these later two evaluation forms in preparing his recommendations in 1971.[2]

At the time of the 96 inch mill shutdown, Rees was manager of hot mill operations at the Ecorse mill of Great Lakes Steel and had maintained that position since 1968. From 1966 to 1968, Rees was assistant manager of the Rolling Division, and before that, from 1961 to 1966, was the superintendent of the 96 inch hot mill and hot strip finish. As a result, Rees was fairly familiar with the work performances of the employees he was now required to evaluate.

After the multi-level evaluation process just described was concluded by the various supervisory personnel involved, recommendations were communicated by Rees to Fishley and Mr. Duffett, vice-president of operations. Officially, it was Fishley and Duffett who made the ultimate decision as to who should be terminated; however, it is also clear that Fishley and Duffett relied heavily and apparently concurred in all rec-

ommendations made by Rees. For all practical purposes, it was Rees' evaluations of the nineteen employees that was determinative of which employees would be terminated or transferred.

Rees indicated in his testimony that there was no predetermined number of individuals that had to be terminated, but rather, the company sought to place the employees displaced from the 96 inch mill as best they could. After the 96 inch mill was closed, employees that had not already been placed in other positions were temporarily assigned to the 80 inch mill as vacation replacement foremen. In this way, the company gained additional time in which to seek replacement positions for the displaced 96 inch mill employees. After evaluating the relative supervisory capabilities of the nineteen employees and transferring employees to available and open positions, Mastie and Seymour were the only two employees who had not been given new positions with the defendant, and thus were temporarily assigned as vacation replacement foremen at the 80 inch hot mill. These positions were never intended by the company to be permanent positions and the plaintiffs do not contend to the contrary. Finally, after the normally heavy vacation season was over in September, both Mastie and Seymour were asked to take early retirement under one of the defendant's retirement programs; or, in the alternative, to take a position as a rank and file employee in the defendant's steel mill. As became apparent to the plaintiffs, however, the retirement benefits available to them would exceed the compensation available as an hourly rank and file employee and, as a result, the plaintiffs refused defendant's offer to return to the rank and file classification.

At the time of the plaintiffs' retirement, defendant maintained both a contributory annuity plan and a non-contributory pension plan for their employees. Employees

---

**2.** The 1968 and 1969 evaluation forms also indicate that Mastie and Seymour were at or near the bottom in the evaluation ratings. However, as the Court will explore later in greater detail, Graebar, superintendent of the 80 inch mill in 1968, believed Redman to be less competent than either Mastie or Seymour.

were given an option to retire under either plan. As the testimony of Mr. Rogerson, general supervisor in salaried personnel, indicated, it was generally the case for employees with long service of employment with the company to take advantage of defendant's non-contributory pension plan. Seymour had earlier terminated his participation in the contributory annuity plan and withdrawn his contributions and, thus, was left with only the non-contributory pension plan option. Mastie had remained a contributing employee of the annuity plan and had the option of either retiring under this plan or the non-contributory pension plan. It became apparent on the basis of the company's computation that Mastie would receive higher monthly retirement benefits by opting for the non-contributory pension plan. Moreover, Mastie was also able to receive in a lump sum his previous contributions to the annuity plan as a result of selecting the non-contributory pension option.

There is no dispute by defendant that at the time plaintiffs were involuntarily retired both were within the protected class under the ADEA. Also, both plaintiffs' ages put them among the oldest, although not the oldest, of the nineteen employees the company could properly consider in filling the available foremen positions at the time. After being involuntarily terminated, the plaintiffs sought relief from various state and federal agencies authorized to administrate the respective age discrimination laws therein. There is no contention made by defendant that plaintiffs have failed to exhaust administrative remedies as provided in 29 U.S.C. § 626(d).

Plaintiffs, in essence, rely on the theory that since they were within the protected class of employees for the ADEA, were terminated from their positions while younger employees were retained, and maintained a certain plateau of ability exceeding the minimum required for the positions in which they could have been placed, that, as a result, their age was "a" factor in the defendant's decision to terminate them. Alternatively, and in support of the above theory, the plaintiffs contend that there was an economic advantage to the defendant in terminating them as opposed to younger employees since they were paid more than younger retained employees and also that their early retirement permitted defendant to avoid higher pension payments had plaintiffs retired at an older age. Since this economic advantage relates in substantial part to the plaintiffs' ages, it is alleged that a decision based on this economic factor, amounts to prohibited activity under the ADEA. Lastly, it is contended that statistical evidence establishes that defendant made its decision to terminate plaintiffs on the basis of their ages.

Defendant, in response to plaintiffs' arguments, contends that plaintiffs were terminated as a result of the curtailment of operations at the 96 inch mill and the bona fide judgment of the management personnel at Great Lakes Steel that plaintiffs had the least ability and potential relative to the other employees evaluated at the time. In support of this contention, defendant points to the established and deliberate evaluation process undertaken by Klemans and Rees in determining which employees should or should not be retained. In particular, great reliance is placed by the defendant on the 1970 evaluation forms prepared for the nineteen employees evaluated and the personal experiences of both Klemans and Rees in observing the employees in actual work situations. It is argued by defendant that whether foreman positions actually needed to be terminated and whether defendant made a correct evaluation in identifying plaintiffs for termination are irrelevant issues for the court in reviewing defendant's actions in regard to any possible ADEA violations.

Lastly, defendant contends that in order for plaintiffs to show a violation of the Age Act, it is necessary to show a specific intent on the part of defendant to discriminate against these plaintiffs and that age must be a "determining" factor in the defendant's action.

The development of the law interpreting and construing the Age Discrimination Act

is still in its embryonic stage. Where decisions have been rendered by the courts under the ADEA, most have concerned procedural prerequisites of the Act which must be fulfilled before filing a civil suit in federal court. However, as indicated earlier, in this case there are no contentions concerning procedural prerequisites to instituting suit. Therefore, the court is squarely faced with an ADEA case requiring disposition on the substantive merits of the respective parties' positions. The case presents significant legal issues as well as factual disputes which must be resolved by the court as the finder of facts.

### A. Age Discrimination in General

Age discrimination in employment has been characterized as unique from race, sex or national origin discrimination. The legislative history is punctuated with references to the special nature of age discrimination. Typical in this regard is the testimony of Willard Wirtz, Secretary of Labor in 1967, before the House Subcommittee investigating the need and scope of age discrimination legislation:

> "I would suggest this kind of discrimination is entirely different from racial discrimination, the root of racial discrimination is purely bigotry. This is not true here." [3]

Similarly, the Supreme Court in a recent case held that in reviewing the constitutionality of an age classification for mandatory retirement in the Massachusetts State Police, it would apply the "rational basis" as opposed to the "strict scrutiny" test of the Fourteenth Amendment equal protection clause. *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). In concluding that age classifications did not require application of the "strict scrutiny" test, the court reasoned that:

> "While the treatment of the aged in this Nation has not been wholly free of discrimination, such persons, unlike, say, those who have been discriminated

against on the basis of race or national origin, have not experienced a 'history of purposeful unequal treatment' or been subjected to unique disabilities on the basis of stereotyped characteristics not truly indicative of their abilities." *Id.* at 2566.

The point of reference from which courts approach the interpretation of the ADEA must reflect the peculiar nature of age discrimination as already noted.

Because of the absence of any widespread, purposeful discrimination on the basis of age, the courts consider it fundamental that they move cautiously and deliberately in ferreting out violations of the Act. Recognizing that age progression is a universal human process, the Sixth Circuit, in *Laugesen v. Anaconda Co.*, 510 F.2d 307 (CA 6 1975), concluded:

> "Thus, while the principal thrust of the Age Act is to protect the older worker from victimization by arbitrary classification on account of age, we do not believe that Congress intended automatic presumptions to apply whenever a worker is replaced by another of a different age." *Id.* at 313, n. 4.

It is, therefore, incumbent upon courts to scrutinize closely the facts of each case in deciding whether the Act has been violated.

■ The Act was never intended to be a panacea for all older workers terminated or not offered employment by an employer. This position is best illustrated by the Statement of Findings and Purpose in the Act itself:

> "(a) The Congress hereby finds and declares that—
>
> \*  \*  \*  \*  \*  \*
>
> "(2) the setting of arbitrary age limits regardless of potential for job performance has become a common practice, and certain otherwise desirable practices may work to the disadvantage of older persons;
>
> \*  \*  \*  \*  \*  \*

**3.** General Subcommittee on Labor of the Committee on Education and Labor; House of Representatives, 90th Congress, First Session, August 1–3, 15–17, (House Hearings) page 13.

"(b) It is therefore the purpose of this Act to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621.

Thus, the Act was designed only to attack those employers' personnel policies and practices which arbitrarily classified employees or potential employees on the basis of age and did not seek to affect employer decisions based on individual assessments of a person's abilities, capabilities and potential.

The prohibition of the Act pertinent to this case is found in 29 U.S.C. § 623:

"(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ."

Unlike some state age discrimination laws,[4] the federal Act only applies to persons who are at least forty years of age but less than sixty-five years of age. (29 U.S.C. § 631) Thus, an employer may discriminate on the basis of age as to persons over sixty-five or under forty years of age. Furthermore, Labor Department Regulation 29 C.F.R. § 860.91(b) illustrates the application of the Act in the following manner:

"(b) Thus, if two men apply for employment to which the Act applies, and one is 42 and the other 52, the personnel officer or employer may not lawfully turn down either one on the basis of his age; he must make his decision on the basis of other factors, such as the capabilities and experience of the two individuals. The Act, however, does not restrain age discrimination between two individuals 25 and 35 years of age."

Likewise, in the instant case a violation of the Act is possible even though employees within the protected class were retained by defendant.

However, not every personnel decision by an employer which results in differential treatment of individuals in the protected class is a violation of the Act. The Act permits certain practices and policies which are not contrary to the general purpose of the Act:

"(f) It shall not be unlawful for an employer, . . . .—

(1) to take any action otherwise prohibited under subsections (a), (b), (c), or (e) of this section where age is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business, or where the differentiation is based on reasonable factors other than age . . . ." 29 U.S.C. § 623(f).

It was the considered judgment of Congress that instances may arise where it would be necessary for an employer arbitrarily to impose age restrictions; however, where an employer makes such an attempt, the burden of proof is on the employer to establish that exceptional circumstances exist justifying such a policy, see 29 C.F.R. § 860.-102(b) and § 860.103(e). On the other hand, an employer need not rely on these defenses where the differential treatment of an individual in the protected class results from an individual assessment as opposed to an arbitrary determination of that person's performance or potential. See *Laugesen v. Anaconda Co.,* 510 F.2d 307, 313 (CA 6 1975). Under these circumstances, the employee must prove that the determining factor in the employer's individual evaluation of the employee was tainted by the employee's age.

## B. *Burden of Proof*

The burden of proof applied to age discrimination litigation has been held to be identical to that promulgated for Title VII litigation by the United States Supreme Court in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Wilson v. Sealtest Foods,* 501 F.2d 84 (CA 5 1974). In *McDonnell Doug-*

---

4. For example, see M.C.L.A. § 423.303a, M.S.A. § 17.458(3a). Covers ages 18 through 60.)

*las,* the court characterized the burden of proof in the following manner:

" . . . by showing (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

"The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection.

\* \* \* \* \* \*

"Petitioner's reason for rejection thus suffices to meet the prima facie case, but the inquiry must not end here. . . . [R]espondent must . . . be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." 411 U.S. at 802–804, 93 S.Ct. at 1824.

As noted by the Sixth Circuit in *Laugesen, supra,* however, the applicability of the *McDonnell Douglas* standard to a discharge age discrimination case is not at all clear. The court, noting that *McDonnell Douglas* concerned race discrimination in hiring, concluded:

"While it may not be unreasonable to assume that in a proper case the guidelines established in *McDonnell Douglas v. Green* can be applied in age discrimination jury cases, we believe it would be inappropriate simply to borrow and apply them automatically." 510 F.2d at 312.

It is, therefore, necessary that the burden of proof applied to age discrimination discharge litigation, such as that in the instant case, be tailored in such a way that relief will be granted in age discrimination cases only in circumstances in which it occurs. To the extent that age discrimination discharge violations are different from race discrimination hiring violations, the law should likewise reflect this difference.

■ As a starting point, the court holds that, as in all other civil litigation, the plaintiff in an age discrimination case has the burden of proving discrimination by the preponderance of the evidence. See *Laugesen, supra,* and *Bittar v. Air Canada,* 512 F.2d 582 (CA 5 1975). Although plaintiff can preclude a directed verdict in the defendant's favor by establishing a prima facie case, this does not relieve the plaintiff of the responsibility of proving discrimination by the preponderance of the evidence. In other words, a prima facie case of discrimination is not synonymous with establishing discrimination by a preponderance of the evidence.

■ It is a rare defendant, however, that will not present evidence that its action was motivated by nondiscriminatory reasons. As a matter of fact, a defendant who fails to present a defense in response to a plaintiff's prima facie case will in all likelihood be found to have violated the ADEA. The burden placed upon the defendant, therefore, is the burden of going forward with the evidence of its defense. See *Bittar, supra.* Although the *Bittar* court was technically correct in its holding that only the burden of going forward shifts to a defendant after a plaintiff's prima facie case has been established, the practical distinction between the burden of going forward with the evidence and the burden of proof to establish a nondiscriminatory reason for the action taken is, in many instances, a distinction without substance.

In the instant case, the defendant presented evidence to the court after the close of plaintiffs' case in chief. It should be noted in this regard that the evidence presented by defendant at this stage of the litigation can be used either to defeat plaintiffs' prima facie case, or to fulfill defendant's obligation of going forward with evidence showing a nondiscriminatory reason for its action, in the event the court determines plaintiffs have established a prima facie case.

An example of the different ways in which the court can utilize the defendant's evidence is illustrated in the *Bittar* and *Laugesen* cases. Both of these cases are

similar to the instant case in that evidence was introduced to the court justifying the discharges of the employees therein due to unsatisfactory work performances. In *Bittar,* the Fifth Circuit noted that the district court concluded that plaintiff had established a prima facie case of age discrimination and defendant's evidence sought to satisfy its burden of going forward with evidence of a nondiscriminatory reason for the discharge. On the other hand, in *Laugesen,* the court characterized the defendant's submission of proof, that it discharged plaintiff as opposed to other younger employees based on the relative merits of the employees for the jobs available, in the following way:

"Anaconda's defense was quite simply that it did not discriminate on account of age in discharging Laugesen. Put otherwise, the defense was simply a denial of the truth of plaintiff's allegation, supported by evidence that the reason for the discharge was a need to reduce personnel generally, together with proof that the selection of plaintiff was based upon the relative merits of the two men for the one position which remained." 510 F.2d at 313.

In other words, the Sixth Circuit considered defendant's evidence as an attempt to defeat plaintiff's prima facie case. The court in the instant case finds that defendant's defense was a denial of plaintiffs' allegations of age discrimination and concludes, on the basis of the evidence presented, that plaintiffs have failed to establish a case of age discrimination by a preponderance of the evidence.

### C. *Prima Facie Case*

Plaintiffs relied essentially on three theories in an attempt to establish a prima facie case. First, it was alleged that plaintiffs were within the protected class of the ADEA and forced to take involuntary retirement, were equal in ability to other employees retained by the defendant, and other employees younger than the plaintiffs were retained by the defendant.

Second, plaintiffs contend that their termination by defendant was prompted by the fact that they were earning higher salaries than other employees and their retention would have required defendant to pay higher pension payments in the future and thus, since these increased labor costs are directly related to the age of an employee, termination on account of this factor is a violation of the ADEA.

Lastly, it is alleged by plaintiffs that a prima facie case of age discrimination can be established through statistical evidence showing that the average age of the nineteen employees evaluated was reduced substantially after the involuntary retirement of Mastie and Seymour. For the reasons noted below, the court concludes that plaintiffs have failed to preponderate on any of these three theories.

### 1. *Employee Evaluations*

As to plaintiffs' first theory, the defendant does not dispute plaintiffs' assertions that they are within the protected class of the ADEA and that younger employees were retained after plaintiffs were forced into early retirement. On the other hand, defendant strongly objects to plaintiffs' claims that they were equal in ability to younger employees retained by defendant.

Plaintiffs offered their own as well as some of their former colleagues' testimony in an attempt to prove that plaintiffs were at least equal in ability to younger employees that were retained. The plaintiffs' own testimony is utilized for the purpose of establishing that their performance on the job was considered satisfactory and even above average by defendant, while the testimony of former employees of defendant is offered to establish that plaintiffs' performance equalled or exceeded the performance of employees who were retained by defendant. In regard to plaintiffs' proofs relative to the work performance of plaintiffs Mastie and Seymour, it will be helpful to separate the two cases temporarily at this point.

### a. *Mastie*

Plaintiff Mastie relies on the following evidence to show that the company regard-

ed him as a competent foreman in the slab yard area. First, plaintiff testified that he was never told by defendant that his job performance was inadequate or unsatisfactory. Second, plaintiff points to a 1966 merit increase and a 1969 job level increase. In this regard, Mastie testified that he believed his level of ability in 1971 was the same as in 1965. Third, plaintiff Mastie contends that defendant's satisfaction with his work performance is demonstrated by a 1965 incident where Rees called him back to work during his vacation because a problem had developed on the job. Fourth, it is intimated, although never expressly stated as such, that Mastie's transfer in 1962 to the 80 inch mill was a promotion because the defendant wanted competent foremen supervising the operations of the new mill. Except for the general character witnesses dealt with *infra*, the aforementioned evidence was all that was presented by plaintiff to indicate that his work performance was satisfactory or above average and not below average, i. e., that Mastie could not have been terminated on the basis that he lacked the requisite minimum skills necessary to perform the slab yard foreman position.

The court finds in this regard that Mastie adequately demonstrated that he possessed the minimum level of skills necessary to perform the slab yard foreman position, but the defendant apparently concedes this much to plaintiff. Defendant, however, disputes any inferences being drawn from the above contentions that would indicate that Mastie not only possessed the minimum skills for the job, but, rather, possessed superior skills in relation to younger employees retained by the defendant. To this end, noted below are the respective arguments made by defendant in response to each of plaintiff's proofs noted heretofore and the court's findings as to the evidence presented.

First, defendant argues that merely because Mastie was never told he was doing a poor job does not resolve the issue of whether Mastie performed his job as well or better than other employees. It is irrelevant in the court's view whether or not Mastie was an above average employee if the defendant can establish that employees who were retained by the defendant were superior.

■ Second, Rees testified that the 1966 merit increase was not only given to Mastie but to all the employees under his supervision because it had been a long time since the last raises had been given. In essence, Rees indicated that the merit increase had no relationship to Rees or the company's assessment of Mastie's job performance. However, the court finds this response not totally persuasive and feels that the 1966 merit increase indicated the defendant's general satisfaction with Mastie's job performance at that time. It would have been a simple procedure merely to deprive Mastie of the merit increase if the company was not satisfied with his performance, but this was not done. On the other hand, since the merit increase was awarded in 1966 and the evaluations resulting in Mastie's involuntary retirement did not occur until 1971, the court accords little weight to this evidence on the crucial issue of the relative capabilities of the nineteen employees in 1971. Moreover, as Plaintiffs' Exhibit No. 17[5] indicates, the 1969 job classification increase from level two to three was a general job level increase for the Turn-Foreman-Slab Yard position. As a matter of fact, the 1969 job level change neither aids or hurts plaintiff's case since, as is clearly noted on the back side of the transfer certificate, "It has been agreed between myself [Mastie] and my superior that this employee is receiving the maximum rate that he is worth at this present time."

Third, the defendant does not offer any evidence in rebuttal to the calling back of Mastie in 1965 due to a problem at work; however, as already noted in this regard, this event occurred six years before the 1971 evaluations which resulted in the com-

5. Although Exhibit No. 17 is the Transfer Certificate for Kenneth J. Seymour, testimony at trial indicated that an identical Transfer Certificate was written for Frank Mastie.

pany's determination of which employees should be retained.

Fourth, defendant notes that Mastie's transfer to the 80 inch mill in 1962 was due to a slowdown in operations at the 96 inch mill to one turn, thereby forcing foremen on the eliminated turns to be transferred to other parts of the mill until operations on the 96 inch mill returned to normal. Defendant contends that a plausible interpretation of the transfer is that the company sought to retain their most experienced foreman to supervise the one turn at the 96 inch mill and transferred the other foremen to the 80 inch mill. The court finds that either interpretation of the transfer is plausible and, thus, this piece of evidence neither aids nor hurts the plaintiff.

b. *Seymour*

Plaintiff Seymour relies on the following evidence to show that the company regarded him as a competent foreman in the slab yard area. First, plaintiff testified that he was never reprimanded for poor work performance by the defendant. Second, after he was returned to the rank and file in 1962, Seymour was reassigned as slab yard foreman by Rees in 1965. In Plaintiffs' Exhibit No. 11, an intra-office memorandum concerning the subject of "Additional Supervisors," Rees wrote: "It should be pointed out that his [Seymour] work was satisfactory and his addition to the force at this time would be an immediate asset." Third, the 1965 evaluation form written by Rees rated Seymour average or above average in every evaluated category. In a similar vein, plaintiff cites the court to Plaintiffs' Exhibit No. 12 which is a Pre-Supervisory Test Result, dated September 28, 1959, which indicates Seymour's test results as "High Average Potential." Fourth, plaintiff had trained employees in the past, in particular, Michaelis and Matthews. Fifth, plaintiff refers to Plaintiffs' Exhibit No. 17 which indicates that Seymour received a job level increase in 1969. Except for the general character witnesses dealt with *infra,* the aforementioned evidence was all that was presented by plaintiff to indicate that

his work performance was satisfactory or above average and not below average, i. e., that Seymour could not have been terminated on the basis that he lacked the requisite minimum skills necessary to perform the slab yard foreman position.

The court finds in this regard that Seymour adequately demonstrated that he possessed the minimum level of skills necessary to perform the slab yard foreman position, but the defendant apparently concedes this much to plaintiff. Defendant, however, does dispute any inferences being drawn from the above contentions that would indicate that Seymour not only possessed the minimum skills for the job, but, rather, possessed superior skills in relation to younger employees retained by the defendant. To this end, noted below are the respective arguments made by defendant in response to each of plaintiff's proofs noted heretofore and the court's findings as to the evidence presented.

First, as with the evidence presented by Mastie, defendant argues that merely because Seymour was never told he was doing a poor job does not resolve the issue of whether Seymour performed his job as well or better than other employees retained by defendant. It is irrelevant in the court's view whether or not Seymour was an above average employee, if the defendant can establish that employees who were retained by the defendant were superior.

Second, Rees testified that he returned Seymour to supervisory status in 1965 because of the company's immediate need for supervisors and, as a result, Seymour's prior experience as slab foreman would be helpful in fulfilling this need. After Seymour returned to supervisory status, however, Rees indicated that he had serious second thoughts regarding Seymour's ability to be a successful supervisor. Although the court finds Rees' testimony weak on this point, the court feels that even assuming Seymour was performing satisfactorily in 1965, this does not resolve the issue of Seymour's relative ability in 1971 when the crucial evaluations were made.

Third, Rees indicated that the 1965 evaluation form for Seymour which rated Seymour above average for each evaluated category was prepared as a vehicle to assist in Seymour's return to the supervisor ranks. Rees' testimony suggests that this evaluation was exaggerated relative to Seymour's actual ability at the time. Moreover, as with the second point already discussed, the employee evaluation form for Seymour was written in 1965, a full six years prior to the time when the critical evaluations were made in 1971. Similarly, plaintiff's reliance on the 1959 Pre-Supervisory Test Result is not very helpful in establishing his relative ability in 1971.

Fourth, defendant offered no evidence in rebuttal to plaintiff's argument that he helped in training two employees. This evidence is of limited value, however, in light of the testimony that new general employees as well as management trainees are all trained on site and given exposure to a variety of operations. The supervisors of the respective operations always play some role in training new employees. There is no dispute that both plaintiffs knew their jobs well and thus would be helpful in training new employees relative to the fundamentals. The question in this case revolves around the supervisory capabilities of the plaintiffs.

#### c. *Favoritism*

Before reviewing the character evidence presented by plaintiffs, the court finds highly significant certain testimony by both Mastie and Seymour. Although Mastie testified that he believed he was forced to take early retirement because of his age, in other portions of his testimony, Mastie indicated that he believed Cason and Eastman were retained for reasons other than their ages. In particular, Mastie felt that there may have been some favoritism by supervisors for some employees and this may have been the reason why certain employees were retained. It is clear that Mastie did not testify that favoritism had a part to play in the retention of all the seventeen employees involved in the evaluation in 1971; however, he felt at least some were probably retained because the supervisors, particularly Klemans, favored some employees over others. The apparent favoritism was prompted by social relationships between the supervisors and the employees under their responsibility. In a similar vein, Seymour testified that Klemans had a personal bias in favor of Eastman and Roman. Seymour also felt that this personal bias was caused because Klemans and certain employees were "drinking partners."

▐ If the court were disposed to take this testimony as fact, it would be extremely harmful to plaintiffs' case. However, plaintiffs' testimony was only speculation based on their perceptions of what were the reasons for the retention of certain employees. The court must make its own determination in this regard on the basis of all the evidence presented to it. The court itself must review the facts presented and make findings of fact and conclusions of law. However, where a party draws a conclusion contrary to the legal position advanced by that party, some doubt is placed in the court's mind concerning the factual basis for the party's legal position. It is in this manner that the court treats plaintiffs' aforementioned testimony.

#### d. *Character Evidence*

Plaintiffs, in attempting to prove that in 1971 they were more qualified than other younger employees retained by defendant, presented the testimony of three former employees of defendant who had knowledge of plaintiffs' work performance.

The first witness was Lawrence Hagerty, a retired heater at the 80 inch mill. Through personal experience in observing the two plaintiffs, Hagerty testified that they were superior or equal to nine of the seventeen employees making up the evaluated group. As to the other eight employees, Hagerty did not feel he had enough contact with them to make a reliable comparison with the plaintiffs. In general, Hagerty indicated that Mastie and Seymour possessed three work traits that made them good and better employees:

(1) Very conscientious;

(2) Always ready to give other employees a helping hand, and

(3) Always performed their jobs satisfactorily as far as he could determine.

The court finds several problems with Hagerty's testimony for the purpose it is offered. Hagerty worked at the 80 inch mill, while the plaintiffs were assigned primarily to the 96 inch mill and, thus, the only times in which Hagerty would observe the work performance of the plaintiffs was while they were assigned to the 80 inch mill. As a matter of fact, it is not clear from the record the amount of time Hagerty actually worked with the plaintiffs. Moreover, Hagerty indicated that his evaluations of plaintiffs' work performances concerned only the parts of plaintiffs' jobs that would bring them into contact with furnace and heater positions and, as a result, he was unable to testify about plaintiffs' performances on other parts of their jobs. Lastly, it is significant to note that a major reason Hagerty considered plaintiffs better employees than others to whom he was asked to compare them was their willingness to help rank and file employees perform bargaining unit work. It was undisputed at trial, however, that supervisory personnel were not permitted to perform bargaining unit work, and, in fact, would be subject to reprimand and discipline for doing such work.

Thus, the court finds Hagerty's testimony of limited value. Not only was his personal contact with the plaintiffs very restricted, but also the criteria used in comparing plaintiffs with other employees in the evaluated group were not the same used by plaintiffs' supervisors.

The second character witness presented by plaintiffs was Peter Killmuyer, a heater at the 96 inch mill. Heaters were directly responsible to slab yard foremen and, thus, Killmuyer came in contact with the two plaintiffs every day. Although Killmuyer did not have enough personal experience with most of the nineteen employees in the evaluated group to compare them with the plaintiffs, he did testify that the two plaintiffs were more competent than many of those with whom he was familiar. Generally, Killmuyer felt that the plaintiffs were more conscientious and reliable and had more experience than the other employees in the evaluated group. Killmuyer also testified that the plaintiffs helped with bargaining unit work more often than any of the other foremen.

Apart from the obvious problem that Killmuyer did not feel sufficiently familiar with most of the employees in the evaluated group to make a comparison with plaintiffs, it is also clear from Killmuyer's testimony that his view of plaintiffs' work performance was from a different perspective than that of plaintiffs' supervisors. Killmuyer was a heater and was supervised by the plaintiffs. It becomes apparent to the court that the factors which make a supervisor likable to his subordinates are not necessarily the same factors which make a good supervisor in the eyes of the company. Thus, the court places little value on this witness' testimony.

The third character witness presented by plaintiffs was Walter Sawicki, assistant general foreman in the No. 5 and No. 6 slab yards at the 80 inch mill. Sawicki indicated that he was familiar with the employees in the evaluated group except the four heater employees, Gardner, Hanak, Beard and Judd. As to the remaining employees, Sawicki believed that as of 1971 the plaintiffs were comparable to or better than the employees in the evaluated group. Sawicki had supervised most of these employees while assistant general foreman of the 80 inch mill. As a matter of fact, Sawicki testified that he would vote both plaintiffs' performance comparable to his own. In general, Sawicki felt that plaintiffs were conscientious and reliable at their jobs. However, it should be noted that during the 1971 evaluations of the nineteen employees in the evaluated group, Sawicki had no input into the evaluation of these employees.

The court finds Sawicki's testimony significant and, if defendant had not introduced convincing contrary evidence, plain-

'tiffs' case would be considerably bolstered by Sawicki's testimony. Evidence in this regard was also provided by George Gabor, a witness called by the defendant. Gabor had been superintendent of the 96 inch mill before his retirement in 1970. Gabor testified that he was familiar with the relative supervisory abilities of the foremen under his authority at the time of his retirement and indicated that prior to 1970, there were three foremen he felt would have to be terminated if there was a reduction in work force, namely, Redman, Seymour and Mastie. In particular, Gabor testified that plaintiffs had difficulty in getting performance from the hourly employees under their responsibility, but that other than this, the plaintiffs were good employees. Also, Gabor recalled two instances where Mastie was disciplined as a result of violations of company rules.

The most significant aspect of Gabor's testimony, however, is that which related to Redmond. Apparently, in 1968, although Gabor was not completely satisfied with Redmond's performance, he believed that if Redmond improved his performance promotion might be possible in two years. However, before the 1969 evaluations were prepared, Redmond was transferred to another position (selecting clerk) in the mill. Although it was not known at the time whether this was a permanent transfer, Gabor considered it to be such. Redmond's transfer sometime in 1968 or 1969 explains the absence of a 1969 evaluation form for him. This may also explain the fact that no 1970 evaluation was prepared for Redmond. However, by 1971, Redmond apparently had been returned to the 96 inch mill, although the circumstances of his return were never detailed. It is reasonable to conclude that Redmond was returned to the 96 inch mill between April, 1970 and July, 1971. In this regard, the court finds that the fact that Redmond was returned to the 96 inch mill as a turn foreman negates the significance of much of Gabor's testimony. Redmond's return to the 96 inch mill indicates that the powers in being at that time felt his performance had improved sufficiently to warrant his return to the foreman position.

### e. *Defendant's Rebuttal*

Defendant did not rely exclusively in its defense on merely rebutting plaintiffs' proofs, but went further to show that its own evaluation in 1971 of the employees in the evaluated group revealed that Mastie and Seymour were the least qualified for the foreman position. As already noted in the recitation of facts, the evaluation process encompassed several supervisory levels ultimately culminating in a decision as to which employees should be terminated if there were insufficient available positions in which to transfer all the displaced employees from the 96 inch mill.

The evaluation undertaken by Rees included reviewing the recommendations made by Klemans and Morgan, personal observations of the evaluated employees by Rees, and review of the evaluation forms of the employees prepared in April, 1970. The recommendations made by Klemans and Morgan were based on day-to-day working relationships with the employees evaluated and the evaluation forms prepared in April, 1970. Although the testimony revealed that these supervisors were not continuously observing their employees during all working time, it is clear from the preponderance of the evidence that these supervisors had a good grasp of the abilities and capabilities of the employees working for them.

Kleman's recommendations on Mastie and Seymour with which Rees essentially concurred concluded that both plaintiffs were lacking in general supervisory skills. In particular, Klemans indicated that his conclusion in this respect concerning Mastie was based on the following factors:

(1) Mastie required constant supervision;

(2) Mastie's work needed to be rechecked;

(3) Mastie performed bargaining unit work. Although most foreman performed bargaining unit work, Mastie received more complaints from the union regarding this point and, thus, Mastie performed bargaining unit

work to a greater degree than other foremen.

Similarly, Kleman's recommendation concerning Seymour was based on the following factors:

(1) Seymour's inability to grasp new situations.

(2) Klemans was concerned about placing Seymour in a pressure situation.

However, in arriving at his conclusion that plaintiffs lacked general supervisory skills, Klemans testified that plaintiffs' production output or other production statistics were not utilized. The court concludes that the company was not legally required to analyze production output data in evaluating employees to be terminated under these circumstances. Although under different circumstances and conditions it might be necessary to review such data in order to formulate bona fide evaluation procedures, the court finds that such was not the situation in the present case.

Rees concluded that Mastie and Seymour had limited capacity with respect to their supervisory ability. This conclusion was based on Kleman's recommendations and Rees' own personal observations of Mastie and Seymour while he was the 96 inch mill superintendent and manager of hot mill operations. Even though Rees considered plaintiffs limited in supervisory ability, he nevertheless candidly testified that both plaintiffs were loyal employees and good, hard workers.

In addition to the general evaluation of Mastie's supervisory ability, three specific instances of discipline against Mastie were noted by defendant. First, Gabor and Mastie testified that Mastie was given one week off following the destruction of equipment and subsequent lost work time while Mastie was foreman at the 80 inch mill. Second, Gabor testified that Mastie was given some time off from work when Mastie failed to follow a directive from Gabor concerning the number of workers to be placed on the hookers crew. Third, Gabor, Rees and Klemans all received complaints from the union concerning the performance of bargaining unit work by Mastie. Although other foremen performed bargaining unit work, Mastie received more frequent union complaints on this matter. The defendant did not present the court with any instances where Seymour had been seriously disciplined and the court can only infer that no such instances exist.

The court finds in this regard that Mastie and Seymour were considered good and loyal employees with whom the company felt satisfied enough to retain for 35 and 36 years, respectively. This fact was documented by the company itself when the plaintiffs were offered employment in the laborer classification. Although instances of poor work performance were documented in Mastie's work history, the court finds that some disciplinary measures are taken against many employees during many continuous years of service with one company. However, the court also finds that defendant bona fidely concluded that plaintiffs' supervisory skills were less than the other employees in the evaluated group and thus arrived at its decision to terminate plaintiffs from the supervisory ranks. The company was dissatisfied with the plaintiffs' supervisory skills and not their general work performance.

In addition to the personal observations of the plaintiffs by their supervisors noted above and the complaints filed by the union concerning the plaintiffs' performance of bargaining unit work, the defendant relied on elaborate evaluation forms prepared for the purpose of evaluating the individual and relative abilities of the respective employees.

The evaluation forms, at least from 1968 to 1971, evaluated employees for the following traits: Quality, Quantity, Knowledge, Organization, Dependability, Initiative, Resourcefulness, Analytic Ability, Judgment, Attendance, On Time Record, Cooperation with Authority, Cooperation with Employees, Attitude, Advancement Potential, Appearance, Acceptance of Responsibilities, Development of Subordinates and Delegation. For each category the employee could be rated either: Poor, Limited, Average, Above Average or Excellent. In

the 1970 evaluation, Mastie and Seymour were the lowest rated employees with scores of 35 and 34, respectively. The next lowest employee was Ransom. There is no doubt that such evaluation forms are properly received in support of defendant's position. Moreover, the 1970 evaluation forms were of a type which had been prepared by the company for their employees for many years. Although there is some question as to whether Klemans or Morgan were properly trained in the techniques of preparing evaluation forms of this sort, there is no evidence suggesting that the company did not intend that the preparation of these forms would not serve as valid and reliable benchmarks in evaluating their employees. The only genuine issue presented by the plaintiffs is whether the forms were properly prepared by individuals with sufficient knowledge about the employees evaluated. However, the court concludes that this is not the issue before it in determining whether the company has violated the ADEA. The question is not whether the evaluation of the affected employees was completely accurate, but rather, whether a thorough evaluation of all employees concerned was genuinely and honestly attempted.

### f. Test For Sufficiency of Evaluation Process

Prior courts have held that an employer can satisfy its burden of objectivity for terminating employees following a reduction in operations by establishing that it conducted and relied on a thorough evaluation process of the employees affected. See *Gill v. Union Carbide Corp.,* 368 F.Supp. 364 (E.D.Tenn.1973), and *Stringfellow v. Monsanto Co.,* 320 F.Supp. 1175 (W.D.Ark.1970). In both *Gill* and *Stringfellow,* termination of some employees was required after a reduction in operations. In concluding that defendant had not discriminated on the basis of age, the court, in *Stringfellow,* commented:

"The method of the company's impartial evaluation of the ability and job performance of each of the plaintiffs and other employees evaluated by Monsanto was based upon established factors and criteria ordinarily utilized for such purpose. The court concludes that the differentiation resulting from the application of such factors and criteria in the plan of evaluation which Monsanto used was based on reasonable factors other than age and in the opinion of the Court constitutes a lawful practice envisioned under, 29 U.S.C.A. Sec. 623(f)." *Id.* at 1181.

Similarly, the court in *Gill* concluded:

"The evidence clearly indicates that the Company officials conscientiously, and without any intention to do anyone an injustice, used these factors (approximately seven criteria) in evaluating the services of its employees in order to determine who must be terminated." 368 F.Supp. at 368.

Moreover, commenting on the plaintiff's allegations that the defendant in *Gill* did not employ the exact type of evaluation procedure found lawful in *Stringfellow,* the court stated: "Each case must rest on the facts and circumstances presented at trial." *Id.* at 369.

The court concludes that the defendant in this case did undertake a concerted and genuine effort to evaluate the employees in the evaluated group and that these evaluations were conducted impartially, conscientiously and without any intention to do anyone an injustice. The court recognizes that it is not inconceivable that an employer might undertake an ostensibly objective evaluation process as a facade to hide violations of the ADEA. However, the court finds that this was not the situation in this case. Thus, plaintiffs have failed in their first theory for establishing a case of age discrimination.

### 2. Higher Cost of Employment

Plaintiff's second theory for establishing a case of age discrimination is that they were terminated because the cost of their employment to the defendant was higher than for younger employees retained and thus, since the higher labor cost had a direct relationship to the plaintiffs' ages, the de-

fendant violated the ADEA. Cost differentials in employment have been denominated as the real rather than imagined reasons for discrimination against the aged.[6] Higher employment costs may result from increased direct compensation or benefit programs, higher training costs, and higher costs brought about by the diminished productivity of older persons resulting from reduced ability or physical disabilities.

In the instant case, plaintiffs argue that defendant benefitted financially from their termination. First, plaintiffs contend that they were receiving the highest monthly salaries of the employees in the evaluated group. However, Defendant's Exhibit No. 8 reveals that Mastie's and Seymour's monthly salary as of August 1, 1971, ranked fifth and tenth, respectively, among the nineteen employees included in the evaluated group. It is, therefore, clear that the defendant was not arbitrarily seeking to terminate those employees receiving the highest rate of pay. Although Mastie and Seymour were the highest paid foremen at the 96 inch mill at the time of the shut down, the court has already found that the company properly included in the evaluated group nineteen employees some of whom were not assigned to the 96 inch mill.

Second, plaintiffs contend that their termination permitted the company to forego higher pension contributions for them. If the plaintiffs were allowed to remain employed with defendant until they reached 65 years of age, their pension benefits would be greater resulting in the defendant being required to make greater pension contributions for plaintiffs. The company had two retirement programs of which employees could avail themselves, namely, the contributory annuity and non-contributory pension plan. Seymour, in 1965, had withdrawn from the contributory annuity plan. Although Mastie was a member of the contributory annuity plan at the time of his retirement, he withdrew his contributions

from the plan at the time of his retirement once it became apparent retirement benefits would be greater under the non-contributory pension plan. As a result, both plaintiffs chose to participate in the company's 70/80 retirement pension plan. This plan permits employees to retire with full benefits if their age plus years of service equals or exceeds the number 70. Mastie's and Seymour's pensions in 1971 were $457.70 and $460.48 per month, respectively, which included a $75.00 additional pension for employees retiring before October 1, 1971. Plaintiffs' position is that this monthly pension would have been greater had plaintiffs been allowed to retire at a later age.

Although the court is convinced by the testimony presented at trial that the plaintiffs' monthly pension benefits would have been greater had they retired at a later age, there was substantial disagreement and confusion relative to whether the company's retirement of any other employee in the evaluated group would cost the company more or less in terms of contributions to the pension fund. On the one hand, there was testimony presented by Mr. Rogerson, indicating that if an employee younger than plaintiffs had been retired, it would have cost the company more in pension contributions; whereas, there was also testimony that after an employee reaches 60 years of age the employee's pension benefits increase at a substantially greater rate than at less than 60 years of age. However, it is also clear that if the company had retired a younger employee in the evaluated group who had not yet worked the requisite number of years for vesting of the retirement program, retirement of this employee would result in *no* additional pension costs to the company. Thus, it is entirely conceivable and consistent with plaintiffs' cost theory that the defendant would rather terminate its younger employees whose pension benefits had not vested. Through a constant turnover of personnel, the company could eliminate costly pension contributions which

---

6. House Hearings, p. 91, William R. Hutton, Executive Director, National Council of Senior Citizens: "A recent Department of Labor study shows that putting an older worker on the payroll, including fringe benefits, costs an average of just five cents an hour more than a younger worker."

the plaintiffs argue are significant enough to have motivated the company to force them into early retirement.

■ However, the court appreciates that it would not be in the best interest of the defendant to terminate its younger employees where the company expects long and beneficial employment from them. A company may consider a person's salary and fringe benefits in relation to other employees when faced with a reduction in force. The Act does not contemplate that an employer must ignore employment costs or face possible ADEA violation charges. Both the legislative history and Department of Labor regulations tend to support the proposition that higher labor costs associated with the employment of older employees constitute "reasonable factors other than age" which an employer can consider when faced with possible termination of an older employee.

The legislative history does not expressly deal with the issue of higher costs associated with older employees except that there was general consensus among those testifying at the House and Senate Subcommittee Hearings on the Age Act that higher out of pocket costs are associated with the employment of older employees.[7] However, certain inferences can be drawn from the legislative history which may shed some light on this issue. For example, Senator George Smathers stated that if the Age Act was interpreted to require employers to hire and employ older workers and provide them with the same fringe benefits as younger workers, regardless of cost, that employers would be provided with a ready justification for refusing to hire and employ older workers, namely, the higher costs of their employment. To eradicate this perceived difficulty that could arise, Senator Smathers proposed the following amendment to the Age Act:

"(g) Nothing in this Act shall be construed to make unlawful the varying of coverage under any pension, retirement, or insurance plan or any plan for providing medical or hospital benefits or benefits for work injuries, where such variance is necessary to prevent the employer's being required to pay more for coverage of an employee than would be required to provide like coverage for his other employees."[8]

Senator Smathers indicated that adoption of this amendment would permit an employer to limit expenditures for fringe benefits for an older employee and thus make the older employee cost competitive with younger employees. In this way, employers would be more willing to promote the Act's purpose of employing more older persons where the cost of their employment is not greater than for other employees. This amendment was not incorporated into the Age Act ultimately enacted by Congress; however, it indicates that the proposed Age Act before Congress was not intended to require employers to employ older persons regardless of the cost of their employment. In order to eliminate the cost differentials between older and younger employees, the proposed amendment would have permitted an employer to vary the coverage of certain fringe benefits, thus producing cost parity for the employer in providing these fringe benefits. Thus, as clearly stated by the sponsor of the amendment, its need was prompted by the expectation that the Age Act would permit an employer to differentiate older employees as a result of the higher cost of employment.

■ Although Senator Smathers' amendment was not incorporated into the Age Act, Labor Department Regulation 29 C.F.R. § 860.120(a) is almost a verbatim translation of the amendment:

"thus an employer is not required to provide older workers who are otherwise protected by the law with the same pension, retirement, or insurance benefits as he provides to younger workers, so long as any differential between them is in

---

7. Note 6, *supra.*

8. Subcommittee on Labor of Committee on Labor and Public Welfare. Senate 90th, 1st Session, March 15–17, 1967, Senate Hearings, p. 30.

accordance with the terms of a bona fide benefit plan."

Apparently, the Labor Department likewise believed that the Act permitted an employer to differentiate on the basis of employment cost, and thus, the aforementioned regulation was designed to eliminate this cost factor and encourage employers to employ more older persons by reducing the benefits provided them. Other portions of the Labor Department regulations also lead this court to the conclusion that differentiations resulting from varying employment costs were intended to be "differentiations based on reasonable factors other than age." For example, 29 C.F.R. § 860.103(h) states:

> "It should be made clear that a general assertion that the average cost of employing older workers as a group is higher than the average cost of employing younger workers as a group will not be recognized as a differentiation under the terms and provisions of the Act, unless one of the other statutory exceptions applies. To classify or group employees solely on the basis of age for the purpose of comparing costs, or for any other purpose, necessarily rests on the assumption that the age factor alone may be used to justify a differentiation—an assumption plainly contrary to the terms of the Act and the purpose of Congress in enacting it."

Significantly, the regulation speaks in terms of "general assertions" rather than "individual assertions" of higher employment costs for older workers. The absence of any discussion in this regulation relative to individual assessments and differentiations on the basis of costs creates, in this court's view, a strong negative implication that the Labor Department interprets the Act as authorizing differentiations on the basis of individual assessments of higher costs for older workers. The court readily concludes that an employer's arbitrary and across-the-board pronouncement that older workers are more expensive to employ than younger workers would be a flagrant violation of the Act.

Thus, even if the court were to assume that the cost of retaining plaintiffs would have been greater for the defendant than for other younger employees in the evaluated group, a conclusion the court finds unnecessary in light of its other findings, the court interprets the ADEA as permitting an employer to consider employment costs where such consideration is predicated upon an individual as opposed to a general assessment that the older worker's cost of employment is greater than for other workers.

### 3. Use of Statistics

Plaintiffs' third theory for establishing a prima facie case of age discrimination is that the average age of the employees in the evaluated group decreased following the termination of plaintiffs. In essence, it is argued that the lowering of the average age of foremen in the evaluated group indicates an intent on the part of the defendant to terminate older employees. Before the termination of Mastie and Seymour the average age of the nineteen employees in the evaluated group was 45.05 years, whereas, after the plaintiffs' termination, the average age of the remaining employees was 43.76 years. Comparing the before and after statistics reveals that the average age of the evaluated employees dropped 1.29 years. The court concludes that a decrease of 1.29 years in the average age of employees remaining employed by a company following termination of some employees does not establish even a prima facie case of age discrimination.

There is ample case support for the proposition that statistics may be used in age discrimination litigation. In *Laugesen, supra,* the Sixth Circuit expressly approved of the use of statistical evidence in a private civil action for individual discrimination. However, the Sixth Circuit indicated that the weight accorded the statistics is a jury question and thus left open the question of the weight that statistics should be given in a bench trial. It is this question that the court will now address. In prior age discrimination cases great statistical

discrepancies were required before the courts attached any great significance to the evidence. For example, in *Hodgson v. First Federal Savings*, 455 F.2d 818, 823 (CA 5 1972), the court found: "Of thirty-five persons hired as tellers or teller trainees during that period all were younger than forty and all but three were under thirty." In *Laugesen*, the plaintiff submitted statistical evidence showing that the average age of salaried employees had been lowered from 43 to 37 years. Also, in *Schulz v. Hickok Manufacturing Co.*, 358 F.Supp. 1208 (N.D.Ga.1973), statistics revealed that since the company had been taken over by new management the average age of district managers had dropped almost thirteen years. In all the aforementioned cases, there was at least some indication that the court considered the statistical evidence at least helpful in determining the presence of an Age Act violation. In another case, *Stringfellow v. Monsanto Co.*, 320 F.Supp. 1175 (W.D.Ark.1970), the court did not find the following statistical evidence significant in revealing possible age discrimination:

| | Average Age Before Shutdown | Average Age After Shutdown |
|---|---|---|
| Maintenance Department | 48.4 | 47.3 |
| Manufacturing Department | 52.5 | 51.5 |
| Personnel Department | 53.6 | 52.5 |

As a result, before statistics are probative of possible Age Act violations, there must be more than a nominal statistical discrepancy. In this court's view, a statistical variation of only 1.29 years does not fit within these parameters.

■ Moreover, even assuming that the statistical difference in this case was legally significant to be probative of an Age Act violation, the court further concludes and cautions that statistics in age discrimination litigation cannot be used exclusively to es-

tablish a prima facie case of age discrimination. Although the court in *First Federal Savings, supra,* concluded that: "While these statistics by themselves would perhaps support a finding that defendant had violated the Act, see *Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421 (CA 8, 1970) . . . ," 455 F.2d at 823,[9] there are persuasive reasons, in this court's opinion, for placing less weight on statistical evidence in age discrimination cases.

Institutional, psychological, economic and physiological restraints to employing the aged suggest that statistics might not be a reliable indicator of an employer's compliance with the Act's proscriptions. In particular, the court feels that the following employment restraints operate against older persons in their quest for employment: higher costs of employing older persons, promotion of employees from the employer's own work force, maintaining a proper work force age distribution, the older applicant's inability effectively to find and interview for employment, unwillingness of older persons to accept training for required skills, and the greater physical difficulties encountered by older persons. Of course, the court does not imply that all of these factors are present in the instant case or that these factors are always found in concert. However, one or more of these employment restraints can distort the normal statistical patterns that would be expected in the employment of older persons. As regards normal employment patterns for older persons, which would be reflected in statistical evidence, the Sixth Circuit noted the following:

"The progression of age is a universal human process. In the very nature of the problem, it is apparent that in the usual case, absent any discriminatory intent, discharged employees will more often than not be replaced by those younger than they, for older employees are

---

**9.** The *Parham* decision has not been followed as indicated by other cases decided under Title VII. See *Shaefer v. Tannian*, 7 E.P.D. Para. 9404 (E.D.Mich.1974) and *E.E.O.C. v. Detroit*

*Edison*, 365 F.Supp. 87 (E.D.Mich.1973), affirmed and reversed on other grounds 515 F.2d 301 (CA 6 1975).

constantly moving out of the labor market, while younger ones move in." 510 F.2d at 313.

Moreover, in commenting on the use of statistics in sex discrimination cases, the Sixth Circuit, in *Equal Employment Opportunity Commission v. New York Times Broadcasting Service, Inc.,* 542 F.2d 356 (1976), concluded:

"We have previously held, although primarily in cases of race discrimination under Title VII, that statistical evidence is an important tool for placing seemingly inoffensive employment practices in their proper perspective, *Senter v. General Motors Corp.,* 532 F.2d 511 (CA 6 1976) . . . we recognize that the two types of discrimination, though having a common source of prohibition in Title VII, have divergent histories and need not always be treated identically." *Id.* at 360.

In a similar vein, the court finds, on the basis of the discussion *supra,* that age discrimination is not identical to either race or sex discrimination and thus the same principles governing the use of statistics in those types of cases should not be applied across the board to age cases. On this basis, precedents citing the extensive use of statistics in race discrimination cases are inapposite, although statistics may be helpful in conjunction with other evidence in developing a prima facie case.

### D. Age as "A" or "Determining" Factor

The court feels compelled to touch on this issue, although its holding that plaintiffs have failed to prove their case by a preponderance of the evidence makes discussion of this issue unnecessary. Plaintiffs argue that an employer violates the ADEA where age constituted any part of the decision to treat older employees different from other employees. In other words, plaintiffs contend that defendant violates the Act whenever age is "a" factor in any personnel action or policy. Defendant, on the other hand, argues that age must be a "determining" factor in an employer's decision to

pursue differential treatment against older workers before it is deemed to have violated the Act.

The court finds that on the basis of the legislative history, Labor Department regulations and authoritative case law, the proper interpretation of the Act is that age must be a "determining" factor in an employer's personnel policies or practices before a violation of the Act occurs. The Senate report to Congress relative to the proposed Age Act states:

"The purpose of this legislation, simply stated, is to insure that age, within the limits prescribed herein, is not a determining factor in a refusal to hire." [10]

Similarly, a Labor Department regulation, apparently derived from the Senate report already noted, indicates the purpose of the Act:

"The clear purpose is to insure that age, within the limits prescribed by the Act, is not a determining factor in making any decision regarding hiring, dismissal, promotion, or any other term, condition, or privilege of employment of an individual." 29 C.F.R. § 860.103(c)

Lastly and most significantly, the Sixth Circuit in *Laugesen v. Anaconda, supra,* after citing Labor Department Regulation 29 C.F.R. § 860.103(c) and the general law relative to proximate cause in tort, expressed the following conclusion on the appropriate instruction that should have been given the jury in that case:

"However expressed, we believe it was essential for the jury to understand from the instructions that there could be more than one factor in the decision to discharge him and that he was nevertheless entitled to recover if one such factor was his age *and* if in fact it made a difference in determining whether he was to be retained or discharged. This is so even though the need to reduce the employee force generally was also a strong, and perhaps even more compelling, reason." (emphasis added) 510 F.2d at 317.

**10.** Senate Report No. 723, 9th Congress, 1st Session, November 4, 1967 at 7.

It is worthy to note that the court utilized the conjunctive "and" and not the disjunctive "or." Thus, not only must the employee show that age was one factor in the employer's decision, but also that it was a determining factor in the employer's decision to discharge or retain the employee.

The court appreciates that in many instances the "a" and "determining" tests will result in similar outcomes; however, there will also be those instances where the two tests will result in different conclusions. Since the court is not presented with the issue, it is not necessary to comment on those instances where utilization of the "determining" test will be different from the "a" test.

*Conclusion*

■ The court is not unsympathetic to the plight of the older worker in today's rapidly developing economy. However, the ADEA was never intended as an all encompassing cure for the employment ills of the nation's aged population. To the extent that the Age Act does not reach sufficiently the important and significant problems faced by the aged, further Congressional action in this area may be desirable. However, it is not this or any court's duty or function to distort the intention and meaning of a Congressional statute, albeit one broadly denominated as remedial civil rights legislation.

In essence, the court finds that plaintiffs have failed to establish a case of age discrimination by a preponderance of the evidence.